UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

FILED

IN THE MATTER OF THE          :      FILED UNDER SEAL
APPLICATION OF THE UNITED     :                              2011 APR -4  P 12: 10
STATES OF AMERICA FOR AN ORDER :     MISC CIVIL NO.
AUTHORIZING THE CONTINUED     :                              US DISTRICT COURT
USE OF A MOBILE TRACKING DEVICE :                            HARTFORD CT

3:17 MJ 905 TPS

## AFFIDAVIT

I, Francis Bellizzi, a Task Force Officer of the Drug Enforcement Administration, having

been duly sworn, state:

## I.  INTRODUCTION

1.      I am an investigative or law enforcement officer of the United States within the

meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United

States who is empowered by law to conduct investigations of and to make arrests for offenses

enumerated in Section 2516 of Title 18 of the United Sates Code.  I have been a Task Force

Officer with the DEA since October 2007.  I am also a member of the New Britain, Connecticut

Police Department and have been assigned to the Narcotics Unit since April 1998.  I have

extensive experience in conducting narcotics investigations and I have obtained and executed

search warrants on numerous occasions in my law enforcement career.  I have received training

and instruction relative to conducting drug investigations.   I have written and executed search

warrants, which have resulted in the seizure of illegal drugs and evidence of drug violations.

Over the past approximately twenty-six years in law enforcement, I have executed seizure

warrants which have resulted in the seizure of assets acquired with drug proceeds and assets

utilized to facilitate drug activities.  I have participated in numerous investigations involving

individuals suspected of distributing illegal drugs, coordinated controlled purchases of illegal

drugs utilizing confidential sources, cooperating witnesses and undercover police officers,

written, obtained and coordinated the execution of search and arrest warrants pertaining to individuals involved in the distribution of illegal drugs, conducted electronic as well as physical surveillance of individuals involved in illegal drug distribution, analyzed records documenting the purchase and sale of illegal drugs, provided testimony in court proceedings, and spoken with informants and subjects, as well as other local, state and Federal law enforcement officers, regarding the manner in which drug distributors obtain, finance, store, manufacture, transport, and distribute their illegal drugs.  In addition, I also receive periodic in-service training relative to conducting drug investigations.  I have prepared numerous affidavits in support of applications for search warrants, arrest warrants, and pen register authorizations. These affidavits and applications have resulted in orders being issued by judges, and have led to the conviction of numerous defendants for violations of narcotics laws.

2.      As part of my duties, I am currently participating in an investigation into suspected criminal activity of Steve VELEZ, ANGEL MULERO and their narcotics distribution organization.  These criminal activities are being conducted in New Britain, Connecticut, Hartford, Connecticut and surrounding communities.  Because the information and evidence gathered during this investigation is voluminous, this affidavit includes only those facts which relate to the need for, and propriety of, the requested authorization; this affidavit does not purport to set forth all of the facts gathered during the course of the investigation of this matter.  As a result of my personal participation in this investigation, through interviews with and the analysis of reports submitted by other agents of the Drug Enforcement Administration (DEA), and by the analysis of reports of electronic and physical surveillance and intelligence gathered through a Cooperating Witness ("CW-1") and Confidential Sources, and on the basis of other information

which I have reviewed and determined to be accurate and reliable, I submit the facts set forth below.

3.      This affidavit is being submitted in support of a an application which seeks an order authorizing the use of a mobile tracking device on an automobile described as a blue 2005 Honda Odyssey bearing Connecticut license plate 291-YBS, VIN #5FNRL38665B084696 which is registered to ANGEL. L. MULERO, 72 Chambers Street, Manchester, Connecticut, and is used by ANGEL MULERO (hereafter "**SUBJECT VEHICLE 1**") and on an automobile described as a white 2010 GMC Yukon bearing New York license plate EXF-1440, VIN #1GKUKKE39AR170739 owned by Hertz but rented to ANGEL MULERO on June 10, 2010 and to be returned June 17, 2010 (hereafter **SUBJECT VEHICLE 2**).  The order sought by this application would authorize the installation, maintenance, tracking, monitoring and removal of the mobile tracking device on **SUBJECT VEHICLE 1 and SUBJECT VEHICLE 2**, to include installation, maintenance and/or removal during daytime or nighttime hours.

3.      There is probable cause to believe that ANGEL MULERO, and others known and unknown, are committing and will continue to commit violations of Title 21, United States Code, Sections 841(a)(1) and 846, (Possession with Intent to Distribute Controlled Substances and Conspiracy), and that MULERO is using **SUBJECT VEHICLE 1** and **SUBJECT VEHICLE 2** to commit and facilitate these offenses.  However, because of MULERO'S and his associates' heightened concern for the presence of police and because the area of Hartford where MULERO uses as his base of operations and the areas of Hartford and New Britain where he travels to conduct his drug trafficking activities are typically inhabited most hours of the day and night, investigators are not able to install the mobile tracking device within the daytime period and seek permission to install the tracking device at any time of the day or night.

4.      The following facts establish probable cause that MULERO is involved in drug trafficking activity and that he uses SUBJECT VEHICLE 1, and will use **SUBJECT VEHICLE 2**, to facilitate drug trafficking activity.  It should be noted that on May 16, 2010, the United States District Court for the District of Connecticut (Bryant, J.) authorized the interception of wire communications occurring over  cellular telephone (860) 250-9499, UFMI 174*303*14807, IMSI 316010156114503 ("Target Telephone 1"), subscribed to Angle Gonzalez, P.O. Box 54988, Irvine, CA 92619, serviced by Sprint and utilized by STEVE VELEZ.  Interception of Target Telephone 1 began on that same day and is presently ongoing.

5.      On June 5, 2010, at approximately 3:47p.m., VELEZ, using Target Telephone 1, called MULERO and said "talk to me."  MULERO replied "no, that the tires arrived already."  VELEZ said "they arrived already?"  MULERO said "yes."  VELEZ replied "alright then because I'm dying to work already."  MULERO responded "well give me a chance to eat something and as soon as I get done I'll call you so we can meet at your house."  VELEZ then said "alright, I'm working on the BMW because the brake lights came on, so take your time."  MULERO said "alright, then when you're done call me and I'll go to you."  VELEZ said alright and the call ended.  Based on my training and experience and the additional calls set forth below, I believe that when MULERO referenced "the tires" to have arrived, he was indicating that he now had kilograms of cocaine available.

6.      On June 5, 2010, at approximately 3:54p.m., VELEZ spoke to his associate IVAN RODRIGUEZ.  During the call, RODRIGUEZ tells VELEZ to call Frank because he "needs two."  VELEZ acknowledges and goes on to say his guy is "coming down to bring it today."  Subsequently, at 3:55p.m., VELEZ calls FRANK LNU and said he spoke to IVAN who asked that he call FRANK.  VELEZ adds that "it should be all set later on today."

4

FRANK acknowledged and asked "how much are the tickets."  VELEZ said he doesn't know

because he just received the call from "his people" and that he still has to "find out the number."

FRANK asked if it's for sure today and VELEZ affirmed and said that he would call back as

soon as he knows more but that it is one hundred percent for today.  Based on my training and

experience, I believe that RODRIGUEZ was informing VELEZ that FRANK LNU needed two

kilograms of cocaine and FRANK LNU was inquiring about the price per kilogram when he

inquired "how much are the tickets."

   7.  At approximately 4:46p.m., VELEZ spoke to IVAN RODRIGUEZ and

told him that "he is coming down now" and "I already got a couple of people that want a couple

too."  VELEZ went on to say "we might get rid of like 5, 6 today or something."  Here, based on

my training and experience, VELEZ was telling RODRIGUEZ that the source was on his way

and that they might receive 5 or 6 kilograms of cocaine that could sell the same day.  At

approximately 5:28p.m., a surveillance team member observed MULERO standing adjacent to

the **SUBJECT VEHICLE**.  MULERO was in the parking lot of an apartment building located at

16 Owen Street in Hartford.  This is an apartment building with numerous units.  There is a unit

in MULERO'S name in the building.  The parking lot can only be accessed by a passcard.  At

about 6:05p.m., a van registered to an address in Manchester, Connecticut arrived and MULERO

got into the back of the van.  Shortly thereafter, MULERO'S  cell phone began to show cell site

activations in an area near VELEZ'S residence at 77 Columbia Street in New Britain.  At about

6:42p.m., the same van that MULERO had been seen getting into was spotted at 77 Columbia

Street.   Shortly thereafter, the van left 77 Columbia Street and went back to 16 Owen Street.

   8.  At 6:44p.m., VELEZ called FNU LNU a.k.a. "Oden" and said "yo,

they're on thirty-third street, you heard?" ODEN said "oh yeah, so you ready?" VELEZ said

yeah, I'm ready, whenever you're ready." ODEN said "a'ight, at two, you heard?" VELEZ said

that's fine. ODEN replied um...I'm a call you when I'm on my way in a few minutes. VELEZ

said at the same place as usual right? ODEN confirmed yes, same place. Here, based on my

training and experience, drug dealers often use code language to refer to drug prices. Here, when

VELEZ referenced "thirty-third street", he was indicating a price of $33,000 per kilogram of

which ODEN requested two kilograms (i.e. "At two.").

     9.     At approximately 7:02p.m., VELEZ spoke to IVAN RODRIGUEZ.

During the call, RODRIGUEZ said "I'm calling to make sure everything is straight. I called

everybody, my nigger." VELEZ said "everybody, thirty-three." RODRIGUEZ said that's it?

VELEZ responded yeah. He gave us the same number from last time. So that's probably where

we're going to make some. RODRIGUEZ then said you talked to FRANK already? VELEZ

replied yeah I did. I gotta go by there right now. I'm going over there right now. RODRIGUEZ

said look....but you told him the number? VELEZ said yeah, I told him 33. RODRIGUEZ said

yo...that nigger owes me five hundred dollars, still. VELEZ asked he owes you 500?

RODRIGUEZ replied yeah, but I'm not saying nothin' about, he said he was gonna pay me,

but...um...I think....thirty-three sounds good. My niggers , [U/I] they're gonna pay more. I'm

gonna try to push it for 33, 5 and then if they complain...you know what I'm sayin? VELEZ said

yeah. RODRIGUEZ asked "aight?" VELEZ said "aight, I told them 33 cause...they...I got, I

got... I got this nigger, O...I got two from him...already gone and then you said FRANK wants

two right? RODRIGUEZ said yeah, yeah...but I was gonna tell you, um...are we breaking 'em?"

VELEZ said yeah, but the last ones, you know what I mean? RODRIGUEZ said "alright,

alright." VELEZ then said no, no, I'm saying because these are already gone, that's why I'm not

breaking none of these." RODRIGUEZ  said alright.  VELEZ then said I only got one left.

RODRIGUEZ said maybe in the next one, I go around.  VELEZ replied "yeah, next round, cause

these...remember he said ten, but he only brought five."  Based on my training and experience,

VELEZ told RODRIGUEZ that the kilograms he had acquired from MULERO were $33,000

each which was the same price as MULERO ad charged on a prior occasion.  VELEZ also

indicated that he had received 5 kilograms of cocaine from MULERO although MULERO said

he would bring ten kilograms.  RODRIGUEZ was stating that he was going to try and charge

$33,500 per kilogram.

  10.  On June 6, at approximately 1:31p.m., VELEZ called MULERO.  MULERO said

"talk to me dude."  VELEZ said "look, hum...are you around here or are you busy?"  MULERO

replied "hum...I'm doing something here...looking for an address here and that kind of stuff, but

as soon as I'm not busy I can see you."  VELEZ said alright, because I'm here.  MULERO

inquired "everything alright?"  VELEZ said yes, hum...god willing, the last one is going out right

now and...MULERO cut him off and said "oh, alright.  I am looking for an address and....I'm

here in the neighborhood still, but I'm looking for an address and thing...and when I'm done I'll

call you to let you know I'm ready.  VELEZ then said "look, but come down with double of what

you brought because this is going out too quick."  MULERO said alright, I'll take...I'll take you

double.  Don't worry."  VELEZ said "yeah, because the last time we agreed on that and you came

down...MULERO again interrupted and said "yes, yes, but what happened was that since I was in

another vehicle that was not mine.  VELEZ said "oh."  MULERO went on to say "and this thing,

you understand?  That's...that's the one that I'm telling you he could go and see you but I'm not

sure if he's going to see you."  VELEZ said "alright, then.  okay."  MULERO then said "I'll

make...I'll take that up to you.  I'll bring that for you."  VELEZ responded "okay."  Based on my

training and experience, VELEZ was telling MULERO that he only had one kilogram left of the

five that MULERO had given to him and that VELEZ wanted an additional ten kilograms of

cocaine (i.e. double of what you brought"). MULERO agreed..

      11.    Later that day, at approximately 3:24p.m., MULERO called VELEZ and said "hey

when you are ready let me know." After some static interrupted the conversation where both

MULERO and VELEZ had trouble hearing each other, MULERO repeated "when you are

ready...when you are ready call me." VELEZ said "hum..I'm picking up a couple of "pesos"

around there, because I'm a little short." MULERO said "that's fine. No, take your time. When

you're ready because I don't want that mess." VELEZ said "oh, alright." MULERO again said

"when you are ready call me." VELEZ said "no, because I don't have anything and they are

asking me for it man." MULERO said "huh?" VELEZ said "the thing is that I have a couple of

people who I have given them stuff and they will give me the money later on. You know?"

MULERO replied "oh, well alright. No, whenever they are ready call me. VELEZ said "well

alright. Let me collect a few more "pesos" that they owe me." Here, based on my training and

experience, MULERO was looking to collect drug proceeds from VELEZ and VELEZ was

indicating that he was short of the full amount he owed to MULERO and needed to collect some

additional money from some of his customers. At approximately 4:40p.m., surveillance team

members observed MULERO arrive in the **SUBJECT VEHICLE** at VELEZ'S residence at 77

Columbia Street in New Britain. MULERO remained there until approximately 6:45p.m. While

MULERO was there, FRANK LNU called multiple times. In two of those calls, VELEZ makes

clear that he and MULERO are counting money. Also, FRANK LNU complains to VELEZ

about the quality of the cocaine that he had received from VELEZ. VELEZ indicated that

FRANK LNU should return it and referred to the dude "who owned it" as being right there. This

confirmed that MULERO is a cocaine source of supply to VELEZ and had driven the **SUBJECT VEHICLE** to VELEZ'S to pick up drug proceeds. There is also probable cause to believe, based on the sequence of calls set forth above, that MULERO drove the **SUBJECT VEHICLE** to deliver the additional kilograms of cocaine that VELEZ had requested earlier in the day. In short, it is believed that MULERO uses the SUBJECT VEHICLE to meet with his drug trafficking associates and conduct business. Thus, the movements of the **SUBJECT VEHICLE** are likely to reveal or lead to evidence of the narcotics offenses under investigation. Through the use of this mobile tracking device, the DEA will be able to track MULERO as he comes and goes to wherever he meets with his narcotics associates, including his source(s) of supply and customers.

12.     On June 10, 2010, MULERO rented **SUBJECT VEHICLE 2.** On the evening of June 10, **SUBJECT VEHICLE 1 AND SUBJECT VEHICLE 2** were observed by surveillance team members parked next to each other in the lot at 16 Owen Street. The use of rental vehicles for short terms is a common tactic employed by drug dealers in conducting their travels for drug trafficking activity because they believe it makes it harder for law enforcement to maintain surveillance and makes detection more difficult. Here, on June 5, 2010, MULERO went to VELEZ'S residence at 77 Columbia Street in New Britain to deliver cocaine in van registered to a third party. On June 6, he went in **SUBJECT VEHICLE 1** to pick up drug proceeds at 77 Columbia from VELEZ. Now, he has a rental car (**SUBJECT VEHICLE 2**) for a one week period. The use of multiple vehicles in an effort to thwart law enforcement is common. There is probable cause to believe that a the rental car used by a large scale drug trafficker like MULERO will lead to evidence of the subject offenses under investigation.

13.     Based on my training, experience, and knowledge of this investigation, the use of a mobile tracking device on **SUBJECT VEHICLE 1** and **SUBJECT VEHICLE 2** will allow law enforcement officers to maintain surveillance on MULERO as he meets with his narcotics associates.  It is my belief that through this surveillance, the DEA will be able to identify additional narcotic associates of MULERO'S as well as their locations.

14.     I, and other law enforcement officers participating in this investigation, have conducted surveillance on drug traffickers on multiple occasions, including in this investigation. In order to conduct a successful local and then interstate surveillance it is important to maintain visual contact of the subject vehicles.  Law enforcement officers have to closely follow which often results in the subjects of the surveillance becoming aware of the surveillance.  In addition, surveillance operations that last for several days more often than not allow the subject of the surveillance to become familiar with the surveillance vehicles.  This becomes even more important as the subject of the surveillance travels to another state and continues to see the same surveillance vehicles.  Attempts are made by law enforcement to switch vehicles, but these actions still do not overcome the fact that visual surveillance must be maintained on the subject vehicles.  It often becomes obvious to the target of surveillance that he or she is under surveillance.  This often results in the drug trafficker switching vehicles, changing addresses, and changing telephone numbers.  In addition, if surveillance is compromised while following **SUBJECT VEHICLE 1** and/or **SUBJECT VEHICLE 2**, the probability that these vehicles will no longer be utilized is very likely.  The subjects in this case are very surveillance conscious and are known to execute countersurveillance measures.  On one occasion when MULERO was being followed, he executed a series of turns in a short space of time, which surveillance team members believed to be an attempt to see if he was being followed.  Surveillance was broken off

as a consequence.  On May 19, 2010, VELEZ was speaking to IVAN RODRIGUEZ and, during the call, VELEZ said to RODRIGUEZ "alright, I just seen the narcs again in a Expedition in black."  RODRIGUEZ replied "yo, you've been smoking dust today?"  VELEZ then said "nah, I'm dead serious.  I just seen him.  He was on the phone.  Just driving.  You know how he drive with one hand like...they leaning to the side and just talking on the phone.  I be noticing them motherfuckers."  With this type of consciousness of police presence, surveillance for extended periods of time is very risky and, therefore, a tracking device will be able to track MULERO'S movement even if surveillance for an extended period of time cannot be maintained.

15.     As mentioned earlier, MULERO has an apartment located at 16 Owen Street in Hartford.  This is an apartment building with numerous units.  It has a parking lot to which access is limited to those with a keycard.  There is also a great deal of pedestrian and vehicular traffic in the area.  As a result, any attempt to install the tracking device in the daytime is fraught with the risk of detection that will compromise this investigation.  The best time to minimize the risk of detection is very late in the night when **SUBJECT VEHICLE 1** and **SUBJECT VEHICLE 2** are in the parking lot and traffic ha died down considerably.  For this reason, the undersigned requests permission to install the tracking device at any time of the day or night.  In addition, based on my training and experience, drug trafficking activity takes place at all hours of the day, including at night-time when due to cover of darkness traffickers believe that chances of detection of their illicit activity is at its lowest.  Accordingly, I request that law enforcement be permitted to monitor the tracking device at any time of the day or night.

16.     It is therefore requested that authorization be given to install and monitor a mobile tracking device within **SUBJECT VEHICLE 1 and SUBJECT VEHICLE 2**.  Use of a mobile tracking device will allow the investigating Agents to monitor the locations to which the

**SUBJECT VEHICLES** are driven without having to remain in close sight surveillance which will greatly reduce the risk that the investigation would be compromised.  I believe that monitoring the mobile tracking device will lead to evidence of the aforementioned offenses as well as to the identification of individuals who are engaged in the commission of these offenses and related crimes.

17.     I request authorization to install and remove the tracking device within or on **SUBJECT VEHICLE 1 and SUBJECT VEHICLE 2**, regardless of whether it is parked on public or private property, to surreptitiously enter **SUBJECT VEHICLE 1 and/or SUBJECT VEHICLE 2** to effect said installation and removal, to track and monitor the location of **SUBJECT VEHICLE 1 and SUBJECT VEHICLE 2**  for a period of 45 days, regardless of whether it is parked on public or private property, and to monitor the tracking device in any district in the United States.  I further request authorization for the installation, maintenance and/or removal and monitoring of the mobile tracking device during the daytime or the nighttime.

18.     I also request that, pursuant to 18 U.S.C. Section 3103a(b), the Court authorize the government to delay notice to MULERO, of the execution of the requested order to install, monitor and remove a tracking device within or on **SUBJECT VEHICLE 1 and SUBJECT VEHICLE 2** to not exceed 90 days from the expiration of the Court's orders, unless for good cause the Court orders a further postponement of the time permitted to serve such notice.  As demonstrated above, MULERO is engaged in continued criminal activity.  Were he and his associates to learn of the existence of the requested Order or to learn of the installation of the mobile tracking device, it would disclose to them that they are under investigation by law enforcement officers.  Based on my training and experience, I believe that this would cause

MULERO to alert his co-conspirators and coordinate an effort to destroy evidence, such as narcotics, drug ledgers or the proceeds of narcotics transactions, and/or flee the jurisdiction and otherwise seriously jeopardize the ongoing criminal investigation. Notice therefore should be delayed so as avoid seriously jeopardizing the ongoing criminal investigation involving VELEZ, MULERO and others known and unknown.

19.     In light of the nature of the application, affidavit, and proposed order, I further request that all be sealed.


FRANCIS BELLIZZI
Task Force Officer
Drug Enforcement Administration

Sworn to and subscribed before me on this the ___ day of June, 2010.

/s/ Judge Thomas P. Smith
HON. THOMAS P. SMITH
UNITED STATES MAGISTRATE JUDGE

13